Slip Op. 10-35

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| FISCHER S.A. COMERCIO, INDUSTRIA AND AGRICULTURA, and CITROSUCO NORTH AMERICA, INC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> - and - <br><br> FLORIDA CITRUS MUTUAL, A. DUDA & SONS, CITRUS WORLD, INC., and SOUTHERN GARDENS CITRUS PROCESSING CORPORATION, <br><br> Defendant-Intervenors. | **Before: Gregory W. Carman, Judge** <br> Court No. 08-00277 |

[Plaintiffs' Motion for Judgment on the Agency Record is GRANTED IN PART. The Final Results of the first administrative review of the antidumping duty order on Certain Orange Juice from Brazil are REMANDED IN PART, with instructions that Commerce consider the additional sales agreement pages submitted by Plaintiffs, reconvert Plaintiffs' United States sales from gallons to pounds-solids, and recalculate the Constructed Export Price of Plaintiffs' United States sales in light of the new information. The Final Results are AFFIRMED as to the conversion of Plaintiffs' home market sales from kilograms to pounds-solids, the calculation of Plaintiffs' inventory carrying cost setoff, and Commerce's application of the "90/60 day contemporaneity rule" to examine a home market sale occurring before the period of review. Plaintiffs' Amended Motion for Oral Argument is DENIED.]

Kalik Lewin (Robert G. Kalik and Brenna Steinert Lenchak); Galvin & Mlawski (John Joseph Galvin), of counsel, for Plaintiffs Fischer S.A. Comercio, Industria and Agricultura and Citrosuco North America, Inc.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Michael J. Dierberg); Mykhaylo A. Gryzlov, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for Defendant.

Barnes, Richardson & Colburn (Matthew Thomas McGrath and Stephen William Brophy) for Defendant-Intervenors Florida Citrus Mutual, A. Duda & Sons, Citrus World, Inc. and Southern Gardens Citrus Processing Corporation.

April 6, 2010

**OPINION & ORDER**

**Carman, Judge:**  Plaintiff Fischer S.A. Comercio, Industria and Agricultura is a foreign producer-exporter of orange juice subject to the final results of the first administrative review of an antidumping duty order on certain Brazilian orange juice.  Certain Orange Juice from Brazil:  Finals Results and Partial Rescission of Antidumping Duty Administrative Review, 73 Fed. Reg. 46,584 (Aug. 11, 2008) ("Final Results").  Plaintiff Citrosuco North America, Inc. is the affiliated importer of Fischer S.A. Comercio, Industria and Agricultura.  (Compl. ¶ 3.)  For simplicity, Plaintiffs are referred to together as "Fischer."

Fischer brings this challenge to a portion of the Final Results pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. 1516a (2006).  The matter is now

before the Court on Fischer's Motion for Judgment on the Agency Record, filed pursuant to USCIT Rule 56.2.[1] The United States ("Defendant" or "government") as well as domestic producers and interested parties Florida Citrus Mutual, A. Duda & Sons, Citrus World, Inc. and Southern Gardens Citrus Processing Corporation ("Defendant-Intervenors") opposed the motion,[2] and Plaintiff filed a reply.[3]

Fischer advances five claims challenging various aspects of the Final Results. (Compl. ¶¶ 26-39.) Fischer's first claim stems from the manner in which its United States sales of not-from-concentrate orange juice ("NFC") were converted from gallons, the unit in which NFC was sold in the United States, into pounds-solids so that they

---

[1] Doc. No. 32: Public Motion for Judgment on the Agency Record ("Public Motion"); Doc. No. 39: Confidential (Final) Motion for Judgment on the Agency Record ("Confidential Motion").

[2] Doc. No. 48: Def.'s Response to Motion for Judgment upon the Agency Record ("Def.'s Public Opp."); Doc. No. 51: Confidential Response in Opposition to Motion for Judgment upon the Agency Record ("Def.'s Confidential Opp."); Doc. No. 49: Defendant-Intervenors' Public Response to Motion for Judgment on the Agency Record ("Def.-Int.'s Public Opp."); Doc. No. 53: Defendant-Intervenors' Final Confidential Response in Opposition to Motion for Judgment upon the Agency Record ("Def-Int.'s Confidential Opp.").

[3] Doc. No. 62: Reply to Defendant and Defendant- Intervenors' Responses in Opposition to Plaintiffs' Motion for Judgment upon the Agency Record ("Public Reply"); Doc. No. 64: Confidential Reply to Defendant and Defendant- Intervenors' Responses in Opposition to Plaintiffs' Motion for Judgment upon the Agency Record ("Confidential Reply").

could be compared with home market sales made in kilograms. (Compl. ¶¶ 28-30.)[4]  A

pound-solid is "a basic and standardized measurement of the amount of dissolved

citrus sugar found in juice." U.S. Int'l Trade Comm'n, Certain Orange Juice From

Brazil, Investigation 731-TA-1089 (Final), Pub. 3838 (Mar. 2006) at 17 n.132. Converting

gallons of NFC to pounds-solids involves determining the weight in pounds of the fruit

sugar solids dissolved in each gallon of NFC. Thus, the sweetness of the NFC is an

essential factor in converting gallons of NFC into pounds-solid of NFC; the sweeter a

batch of NFC is, the heavier will be the fruit sugar solids it contains. Fischer contends

that Commerce distorted the price paid for its United States NFC sales by converting to

pounds-solids using the actual sweetness of each individual shipment of NFC, rather

than converting based upon an assumed amount of sweetness that actually determined

the price of Fischer's NFC sales. According to Fischer, this conversion error had the

effect of lowering the gross unit price[5] of Fischer's United States sales below the price

actually paid by the United States buyer, resulting in an increased dumping margin

contrary to substantial evidence in the record. (Public Motion at 18-23.) Second, Fischer

argues that a similar error in Commerce's conversion of home market NFC sales from

---

[4] This claim is contained in Count Two of Fischer's complaint.

[5] Gross unit price is calculated by dividing the price paid for the shipment of NFC by the number of units (i.e. gallons or pounds-solids) contained in the shipment. See Black's Law Dictionary 1309 (9th ed. 2009) (defining unit price as "price of a food product expressed in a well-known measure such as ounces or pounds").

kilograms to pounds-solids caused an improper increase in the gross unit price in the home market, which was unsupported by substantial evidence. (Id. at 28.) Third, Fischer claims that Commerce abused its discretion by rejecting documents that Fischer submitted in response to the preliminary results of the administrative review, despite the fact that the submission was made almost nine months after the regulatory deadline had expired for the filing of factual information. Fischer asserts that Commerce was required to accept these documents, despite their lateness, because they simply clarified errors in information already timely submitted. (Id. at 24-27.) Fourth, Fischer claims that, in calculating the statutory Normal Value ("NV") of Fischer's home market sales, Commerce used an inventory carrying cost offset based on industry-wide average costs, rather than using data submitted by Fischer which showed the actual inventory carrying costs for the specific home market NFC sales under consideration. According to Fischer, this error distorted NV and was unsupported by substantial evidence. (Id. at 29-30.) Fifth, Fischer challenges Commerce's application of 19 C.F.R. 351.414(e)(2) (the "90/60 day contemporaneity rule"), pursuant to which Commerce considered a home market sale occurring outside the Period of Review ("POR") when calculating the antidumping margin. Fischer claims that, in doing so, Commerce acted contrary to statute and its own regulations. (Id. at 30-33.) Fischer also moves for oral argument.[6]

---

[6] Doc. No. 63: Amended Motion for Oral Argument.

As discussed in full below, the Court concludes that: (1) Commerce relied on Fischer's mistaken reporting of an incorrect conversion factor and, as a result, calculated an inaccurate gross unit price for Fischer's United States NFC sales, and (2) Commerce abused its discretion when it rejected materials Fischer submitted after the preliminary results of the investigation, which reliably established the mistake and demonstrated the correct conversion factor. On the other hand, both (3) Commerce's calculation of the gross unit price of home market NFC sales and (4) Commerce's calculation of inventory carrying cost offsets were supported by substantial evidence, and (5) Commerce acted in accordance with statute and regulation in applying its 90/60 day contemporaneity rule. The Court therefore grants in part Fischer's Motion for Judgment on the Agency Record, affirms Commerce's determination of NV for Fischer's home market sales and its use of the 90/60 day contemporaneity rule, and remands to Commerce for recalculation, as detailed below, of the gross unit price of Fischer's United States NFC sales using the appropriate conversion factor. Fischer's Amended Motion for Oral Argument is denied.

## FACTUAL BACKGROUND

The antidumping duty order underlying this case went into effect on March 9, 2006. Antidumping Duty Order: Certain Orange Juice from Brazil, 71 Fed. Reg. 12,183 (Mar. 9, 2006) ("AD Order"). On March 2, 2007, Commerce published a notice of

opportunity to request administrative review of the order, with the POR extending

from August 24, 2005 to February 28, 2007.  Antidumping or Countervailing Duty

Order, Finding, or Suspended Investigation; Opportunity to Request Administrative

Review, 72 Fed. Reg. 9,505 (Mar. 2, 2007).  Upon request, Commerce began a first

administrative review.  Initiation of Antidumping and Countervailing Duty

Administrative Reviews, 72 Fed. Reg. 20,986 (Apr. 27, 2007) ("Notice of Initiation").  In

the course of the review, Fischer provided relevant information in several responses

and supplemental responses to questionnaires from Commerce.  These responses are

contained in the administrative record as follows:  (1) the "Section A Response" (Letter

w/Attachment(s) from law firm of Kalik Lewin to Sec of Commerce Fischer Sec A

Qnaire (May 5, 2007), PR 22, CR 2)[7]; (2) the "Section B Response" (Letter

w/Attachment(s) from law firm of Kalik Lewin to Sec of Commerce Fischer Qnaire B

Response (June 1, 2007), PR 24, CR 3); (3) the "Section C Response" (Letter w/

Attachment(s) from law firm of Kalik Lewin to Sec of Commerce Fischer Qnaire C

Response (June 1, 2007), PR 25, CR 4); (4) the "First Supplemental AB" (Letter w/

Attachment(s) from law firm of Kalik Lewin to Sec of Commerce Fischer Supp Qnaire

Secs A&B (Oct. 10, 2007), PR 47, CR 15); (5) the "Supplemental C" (Letter w/

Attachment(s) from law firm of Kalik Lewin to Sec of Commerce Fischer Supp Sec C QR

---

[7] "PR" refers to the public version of the official administrative record, and "CR" refers to the confidential version.

(Nov. 5, 2007), PR 58, CR 21); (6) the "Second Supplemental AB" (<u>Letter</u>

<u>w/Attachment(s) from law firm of Kalik Lewin to Sec of Commerce Fischer Supp QR</u>

<u>Secs A&B</u> (Nov. 15, 2007), PR 63, CR 24); (7) the "First Supplemental BC" (<u>Letter</u>

<u>w/Attachment(s) from law firm of Kalik Lewin to Sec of Commerce Fischer Supp QR</u>

<u>Secs B&C</u> (Dec. 17, 2007), PR 69, CR 28); and (8) the "Second Supplemental BC" (<u>Letter</u>

<u>w/Attachment(s) from law firm of Kalik Lewin to Sec of Commerce Fischer Supp Sec</u>

<u>B&C QR</u> (Mar. 13, 2008), PR 80, CR 35).

The preliminary results of the first administrative review were published on

April 7, 2008. Certain Orange Juice from Brazil: Preliminary Results and Partial

Rescission of Antidumping Duty Administrative Review, 73 Fed. Reg. 18,773 (Apr. 7,

2008) ("Preliminary Results"). In the Preliminary Results, Commerce determined the

weighted-average dumping margin for Fischer to be 2.46 percent for the period August

24, 2005 through February 28, 2007. <u>Id.</u> at 18,778.

Following publication of the Preliminary Results, Fischer timely submitted a case

brief on May 8, 2008. (<u>Brief from Law Firm of Kalik Lewin to Sec of Commerce Fischer</u>

<u>Case Brief</u>, PR 103, CR 48 ("Case Brief").) Commerce sent a letter to Fischer the same

day stating that it had "determined that certain information contained in [the] case brief

represents new and untimely filed factual information." (<u>Letter from Program Mgr/IA</u>

<u>to law firm of Kalik Lewin rejecting your submission / Fischer</u>, PR 105 ("Rejection

Letter").) Fischer deleted the rejected portions of the case brief and resubmitted it in accordance with the instructions of Commerce on May 12, 2008. (Letter w/Attachment(s) from Law Firm of Kalik Lewin to Sec of Commerce Fischer Case Brief, PR 106, CR 50 ("Resubmitted Case Brief").) Commerce then published the final results of the first administrative review on August 11, 2008, finding a dumping margin of 4.81 percent for Fischer. Final Results at 46,585.

Fischer brought this suit pursuant to § 516A(a)(2)(A)(i)(I) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(A)(i)(I), permitting challenges to the final results of an antidumping administrative review upon the filing of a summons and complaint "contesting any factual findings or legal conclusions upon which the determination is based." 19 U.S.C. § 1516a(a)(2)(A). (See Compl. ¶ 1.)

## JURISDICTION & STANDARD OF REVIEW

The Court of International Trade has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

In reviewing a challenge to the final results of an antidumping administrative review, the Court shall hold the final results unlawful if they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Huaiyin Foreign

Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "Substantial evidence requires more than a mere scintilla, but is satisfied by something less than the weight of the evidence." Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (internal citations and quotation marks omitted).  The Court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion."  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citations and quotation marks omitted).  Agency factual findings are supported by substantial evidence where the agency explains the standards applied and "demonstrates a rational connection between the facts on the record and the conclusions drawn."  Alloy Piping Prods., Inc. v. United States, Consol. Court No. 08-00027, Slip. Op. 10-15 at 4 (C.I.T. 2010) (citing Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984); see also NMB Sing. Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("[T]he path of [the agency]'s decision must be reasonably discernible to a reviewing court.").

DISCUSSION

## I.  Alleged Errors in Calculating Dumping Margin

In its Section A Response, Fischer reported that it sold NFC in the United States "either on a pounds/solids or a per gallon basis," and in the home market "on a per

kilogram basis." (Section A Response at A-17.) Commerce instructed Fischer to

"describe any conversion factors necessary to put the sales on the same basis," and

Fischer filed a document in response which illustrated the proper way to convert both

United States and home market sales to common measurements expressed in pounds-

solids. (Id.) The conversion formula document reads as follows:

> Standard conversions:
>
> The standard brix value[8] for NFC is 11.8
>
> Kilograms *divided by* .45359237 = Pounds
> Pounds *multiplied by* Brix *divided by* 100 = Pounds of Solids
>
> . . .

---

[8] Brix is a unit of measurement for sugar solutions, expressed in degrees, "so graduated that its readings at a specified temperature represent percentages by weight of sugar in the solution." Webster's New Collegiate Dictionary 138 (1981). Orange juice with a higher Brix value is sweeter, and orange juice typically achieves Brix degree levels in the 60s when concentrated. See generally Tropicana Prods., Inc. v. United States, 16 C.I.T. 155, 789 F.Supp. 1154 (1992); see also National Juice Products Ass'n v. United States., 10 C.I.T. 48, 57 n.13, 628 F.Supp. 978, 987 n.13 (1986) ("Degree brix is a measurement of the percentage of the soluble solids (sugar) in a concentrate, as measured in air at 20° centigrade and adjusted for the acid correction of the solids. Thus, manufacturing concentrate with a brix value of 65° contains 65 pounds of fruit sugar solids in every 100 pounds of solution."). The Court notes that the term Brix derives from the last name of the inventor of the scale. Webster's New Collegiate Dictionary 138 (1981). Although the term should therefore be capitalized, it often is not; the capitalization used in source documents will be retained when those documents are quoted in this opinion.

> Using the above conversions along with the USDA
> Conversion Table[9] the conversion of 1 gallon of NFC into
> pounds of solids as follows:
>
> Per USDA Conversion Table:  1 Gallon @ 11.8 Brix = 8.717
> Pounds
> 8.717 Pounds *multiplied by* 11.8 *divided by* 100 = 1.029 Pounds
> of Solids

(Section A Response, Ex. 19.)

The first part of the formula demonstrates how kilograms of NFC are converted into pounds-solids of NFC.  First, the number of kilograms is divided by the factor .45359237, a constant which converts kilograms into pounds.  To convert the resulting number of pounds of NFC into pounds-solids, the pounds are multiplied by an appropriate Brix measurement, and the result is divided by 100, yielding a number of pounds-solids as the final conversion result.  The formula set out above illustrates the conversion by placing the standard Brix measurement of 11.8 degrees into the formula for the Brix factor.  (Brix of 11.8 degrees is considered "standard" because that level is the average Brix value of unconcentrated natural orange juice in United States commerce.  See 19 C.F.R. § 151.91.[10])

---

[9] UNITED STATES DEPT. OF AGRICULTURE, FILE CODE 135-A-50, TECHNICAL INSPECTION PROCEDURES:  SUCROSE CONVERSION TABLE (1970).

[10] Section 151.91 is not binding outside the context of determining tariff rates; it merely serves here to illustrate the basis for referring to 11.8 degree Brix as "standard" for NFC.

The second part of the formula demonstrates how gallons of NFC are converted into pounds-solids of NFC. The first step is determining, based on the USDA Conversion Table, how many pounds each gallon of NFC weighs. Doing so requires choosing the appropriate Brix measurement for the gallons of NFC, since gallons of NFC with a higher Brix degree contain more dissolved sugars and consequently weigh more. Once the appropriate Brix variable is chosen, the USDA Conversion Chart provides the corresponding weigh in pounds per gallon of NFC. This number of pounds is then multiplied by the same Brix variable chosen in determining the pounds per gallon of NFC, and the result is divided by 100. The end result of this calculation provides the number of pounds-solids per gallon of NFC.

## A.   United States Sales

The USDA measured the average Brix of each shipment of Fischer's orange juice upon entry into the United States, establishing a "USDA Brix" or "actual Brix" value which varied with the minor fluctuations of sweetness naturally occurring from shipment to shipment of NFC. (Public Motion at 9.) On June 1, 2007, Fischer replied to Commerce's request for "the brix level at which the product is sold" by reporting in its Section C Response (at C-3) the actual Brix levels as measured by the USDA for each United States sale under review. (See Public Motion at 15.)[11] Fischer then calculated the

---

[11] In its Public Motion, Fischer erroneously refers to this information having been reported in its Section B Response at B-2. (Public Motion at 15.) The Section B

gross unit price per pound-solid of its United States sales (also reported to Commerce on June 1, 2007) by converting the sales into pounds-solids using the conversion formula given above and filling in the Brix variable with the actual Brix figures for each shipment as measured by the USDA. (See Public Motion at 3, 15.) Fischer claims that these calculations were made in error because Fischer's sales in the United States were priced assuming a standard Brix level of 11.8, but Fischer accidentally reported actual Brix—and then based the calculated gross unit price on mistakenly-reported actual Brix. (Public Motion at 3, 15.)

Without yet discussing the appropriateness of choosing any particular Brix number as the factor for converting United States sales from a gallons to a pounds-solids basis, the Court notes that the conversion formula has the mathematical property of yielding lower United States unit prices as the Brix conversion factor increases. The following table illustrates this effect by contrasting the gross unit prices yielded by a hypothetical USDA Brix measurement of 12.5 degrees against those that result using the standard Brix of 11.8 degrees, when applied to conversion of a hypothetical sale of 100,00 gallons of NFC for a price of $100,000:[12]

Response, however, contains information regarding "Sales in the Home Market" (Section B Response at B-1), while the Section C Response contains information regarding "Sales to the United States" (Section C Response at C-1).

[12] Numbers here are rounded off at eight decimal places. The conversion employs the formula used in the administrative review, given in Fischer's Section A

| Conversion formula: (1) USDA Sucrose Conversion Chart value of pounds per gallon at Brix x Brix ÷ 100 = pounds-solids per gallon (2) Pounds-solids per gallon x total sale gallons = total pounds-solids sold (3) Total sale price ÷ total sale pounds-solids = price per pound-solid | | |
|---|---|---|
| | **Hypothetical USDA Brix of 12.5°:** | **Standard Brix of 11.8°:** |
| (1) | 8.742 pounds per gallon at 12.5° x 12.5 ÷ 100 = **1.09275 pounds-solids per gallon** | 8.717 pounds per gallon at 11.8° x 11.8 ÷ 100 = **1.028606 pounds-solids per gallon** |
| (2) | 1.09275 pounds-solids per gallon x 100,000 total sale gallons = **109,275 total pounds-solids sold** | 1.028606 pounds-solids per gallon x 100,000 total sale gallons = **102,860.6 total pounds-solids sold** |
| (3) | $100,000 ÷ 109,275 = **$0.91512240 per pound-solid** | $100,000 ÷ 102,860.6 = **$ 0.97218955 per pound-solid** |

As the table shows, converting a sale from gallons to pounds-solids using a Brix value higher than standard Brix yields a lower gross unit price than converting the same sale to pounds-solids using standard Brix.

Fischer illustrated this effect as applied to the actual United States sales observations considered by Commerce in the administrative review with a chart that Commerce accepted into the official administrative record. (Resubmitted Case Brief at Ex. 2, PR 103 ("Comparison Chart").) The Comparison Chart accurately notes, for example, that Fischer's United States sale #317 has a gross unit price when converted from gallons to pounds-solids using actual degrees Brix that is more than 12¢ lower per pound-solid than the price that would result if the conversion used the standard Brix of 11.8 degrees. (Id.)

---

Response, Ex. 19.

    B.      Home Market Sales

Fischer claims that it made a similar reporting mistake as to its home market

sales, providing the minimum permissible Brix level of 10.5 degrees instead of the Brix

level at which home market sales were actually priced.  (Public Motion at 28.)  Fischer

appears to argue that home market sales were priced at the standard Brix level of 11.8

degrees.  (See Public Motion at 28 (referring to the sample conversion chart and stating

that "Plaintiffs informed Commerce in the Section A Response that the Brix levels [sic]

of NFC sold in the home market is also 11.8.").)  But Fischer's Public Reply can also be

read as suggesting that actual Brix should have been used.  (See Public Reply at 5

(challenging Commerce's reliance upon minimum Brix levels "and not the actual or

standard brix levels of the sale," but not specifying which Brix level Commerce should

have relied upon), 9 (stating Commerce relied on minimum Brix levels rather than

actual levels); see also Resubmitted Case Brief at 2 (stating that "Fischer sells to its

Brazilian customer on a kilogram basis.  The drums are filled either to 180 or 185

kilograms.  The customer pays based on kilograms and not based on brix levels.").)

Fischer submitted a product specification sheet from the home market showing a

minimum Brix of 10.5 degrees, with no maximum or target Brix provided.

(Supplemental AB at Ex. 15.)  However, Defendant points out, correctly, that Fischer

reported varying Brix levels for home market NFC sales, which is inconsistent with

Fischer's claim that it reported uniform minimum Brix levels in the home market sales listing.  (Def.'s Public Opp. at 24; see Section B Response, CR 3, Ex. 2.)

Again examining the mathematical properties of the conversion formula, the Court notes that using a lower Brix number when converting home market sales from kilograms to pounds-solids results in a higher unit price—the converse of the effect illustrated in Fischer's Comparison Chart for United States prices.  The following table illustrates this, contrasting the home market minimum Brix of 10.5 degrees with standard Brix of 11.8 degrees, as applied to a hypothetical sale of 100,00 kilograms of NFC for $100,000:[13]

| **Conversion formula:** (1) Kilograms ÷ .45369237 = pounds (2) Pounds x Brix ÷ 100 = pounds-solids (3) Total shipment price ÷ pounds-solids = price per pound-solid | | |
|---|---|---|
| | **Minimum Brix of 10.5°:** | **Standard Brix of 11.8°:** |
| (1) | 100,000 kilograms ÷ .45359237 = **220462.26218488 pounds** | 100,000 kilograms ÷ .45359237 = **220462.26218488 pounds** |
| (2) | 220462.26218488 pounds x 10.5° Brix ÷ 100 = **23148.53752941 pounds-solids** | 220462.26218488 pounds x 11.8 Brix ÷ 100 = **26014.54693782 pounds-solids** |
| (3) | $100,000 ÷ 23148.53752941 = **$4.31992733 per pound-solid** | $100,000 ÷ 26014.54693782 = **$3.84400314 per pound-solid** |

---

[13] Numbers here are rounded off at eight decimal places.  The conversion follows the formula used in the administrative review, given in Fischer's Section A Response, Ex. 19.

Because kilogram to pounds-solids conversions made using a lower Brix factor result in higher home market unit prices, the result would be an increased difference between home market and United States prices and, consequently, a greater dumping margin.

### C.      Inventory Carrying Costs

On June 1, 2007, Fischer provided Commerce with a chart each for frozen concentrated orange juice ("FCOJ") and NFC, calculating average inventory carrying cost.  (Section B Response, Ex. 12.)  Fischer asserted in its Public Motion that Commerce ignored these charts when it "calculated inventory carrying cost based upon an average inventory cost for all products" instead of using the "actual carrying charge associated with NFC sales and a separate charge associated with FCOJ sales."  (Public Motion at 29.)  Fischer later recharacterized the alleged error, contending that Commerce rejected submissions that showed "the actual number of days that each home market NFC sale was held in inventory, and recalculated inventory carrying costs on an invoice specific basis."  (Public Reply at 5.)

## II.   Analysis

### A.      Rejection of the Extra Pages as Untimely Factual Information

The first question to be addressed is whether Commerce's decision to enforce its deadline for the submission of factual information and reject the additional agreement pages that accompanied Fischer's Case Brief was an abuse of discretion.

1.      Fischer's Position:

Fischer claims that Commerce should have accepted the additional pages of the agreement because they merely clarified information already in the record.  According to Fischer, the additional excerpts of the agreement were submitted "[s]o that Commerce could read and understand" the previously submitted agreement extract, revealing the previously submitted extract to be a "key provision" indicating that "brix levels higher than 11.8 were not subject to a price adjustment."  (Public Motion at 25.) Fischer thus characterizes the additional agreement pages as "not new information, but rather clarification material," since they were "already cited within the text of the Agreement attached at the Supplemental C response."  (Id.)  Commerce abused its discretion in rejecting the additional pages, Fischer claims, because Commerce must allow correction of any error, so long as the error is identified before the final results, involves "a straightforward mathematical adjustment," and would not delay the Final Results.  (Id. at 25-26 (citing Timken U.S. Corp. v. United States, 434 F.3d 1345, 1353 (Fed. Cir. 2006), cert. denied, 549 U.S. 1030 (2006) ("Timken") and NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208-09 (Fed. Cir. 1995) ("NTN Bearing").)  Fischer also contends that, in classifying the additional agreement pages as new factual information, Commerce violated its own policy of accepting correction of unintended errors pursuant to the criteria set forth in Certain Fresh Cut Flowers from Colombia, 61 Fed.

Reg. 42,833, 42,834 (Aug. 19, 1996) (the "Colombia Flowers criteria"). (Id. at 26-27.) In Fischer's view, the Case Brief satisfied the Colombia Flowers criteria because it (1) identified deficiencies in Fischer's previous submissions, (2) gave reliable evidence of those errors in the extra agreement pages, (3) corrected the errors at the earliest opportunity, since Fischer first noticed the errors when it received the Preliminary Results, and (4) required only a small change to the numbers used in the conversion formula. (Id. at 27.)

        2.     The Government's Position

The government claims that Commerce appropriately rejected the additional agreement pages as untimely submitted new factual information. Defendant points out that the additional agreement pages were submitted on May 7, 2008,[14] almost nine months after the August 20, 2007 deadline for the submission of factual material set by 19 C.F.R. § 351.301(b)(2), and that pursuant to 19 C.F.R. § 351.302(d)(1) Commerce cannot consider material rejected as untimely. (Def.'s Public Opp. at 5, 17-19.) According to Defendant, while Commerce may extend deadlines for good cause pursuant to 19 C.F.R. § 351.302(b), Fischer neither requested nor demonstrated grounds for an extension. (Id. at 19.) The government cites several court decisions upholding Commerce's authority to establish and enforce its own rules of procedure and

---

[14] Although the Case Brief bears the date "May 8, 2008" on its cover sheet, Commerce stamped it as received on May 7, 2008. (See PR 103, CR 48.)

deadlines:  Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435

U.S. 519 (1978); Uniroyal Marine Exports Ltd. v. United States, 33 CIT ___, 626 F. Supp.

2d 1312 (2009) ("Uniroyal"); Yantai Timken Co., Ltd. v. United States, 521 F. Supp. 2d

1356, 1371 (C.I.T. 2007) ("Yantai"), aff'd 300 Fed. App'x 934 (Fed. Cir. 2008); Tianjin

Machinery Import & Export Corp. v. United States, 28 CIT 1635, 353 F. Supp. 2d 1294,

1303-04 (2004).

While maintaining that Fischer's additional pages were properly rejected as

untimely, Defendant also appears to argue that Fischer's additional pages were not

rejected for being untimely.  Specifically, the government argues that NTN Bearing is

inapposite here since NTN Bearing stands for the proposition that "it was an abuse of

discretion for Commerce to refuse to correct factual errors in information submitted by

the producer based upon timeliness when the errors were identified prior to the final

determination," but Commerce rejected Fischer's argument on its merits, not for

untimeliness.  (See Def.'s Public Opp. at 20-21 (stating "[h]ere, in contrast [to Timken

and NTN Bearing], Fischer asked Commerce to apply a different methodology" and

"Commerce rejected Fischer's request because Commerce found that the methodology

used in conversion was appropriate," so there was "no error to correct.").)  Defendant

also argues that Timken held only that Commerce cannot "refuse to correct factual

errors in information submitted by the producer, identified prior to the final results,

solely because the errors were not 'clerical' in nature," and, accordingly, that Timken does not apply here because Commerce did not reject Fischer's additional pages on the grounds that they were not "clerical" in nature. (Id.)

Finally, Defendant states that Commerce "did not use, and had no reason for using, the Colombia Flowers factors," which is "a test that Commerce used to use when evaluating whether to correct errors in information submitted by a party," but was invalidated by Timken at least to the extent that it limited the correction of errors to those that were clerical in nature. (Id. at 21-22.)

### 3. Defendant-Intervenors' Position

Defendant-Intervenors contend that Commerce properly rejected the additional agreement pages submitted by Fischer because "this information cannot be fairly characterized as merely clarification material," but rather represents "an abrupt tactical shift, once [Fischer] found that it had miscalculated its dumping margin." (Def.-Int.'s Public Opp. at 15-16.) Defendant-Intervenors, like Defendant, argue that Timken, Yantai, and NTN Bearing are inapplicable because they only allow for the late correction of errors, but conversion of Fischer's sales into pounds-solid using actual Brix measurements did not lead to an erroneous result. (Id. at 16-17.) According to Defendant-Intervenors, Fischer did not satisfy the Colombia Flowers test because the errors it alleges (1) were not clerical, (2) were unsupported by reliable evidence, (3) were

not corrected at the earliest opportunity, and (4) required substantial changes to the Preliminary Results. (Id. at 17-18.)

**B.      Rejecting the Additional Agreement Pages Was an Abuse of Discretion**

Timken and NTN Bearing both stress that, at the preliminary results stage, Commerce abuses its discretion where it refuses to let a respondent establish an accurate dumping margin by correcting mistakes in its response. Finality concerns only begin to counterbalance accuracy concerns when the administrative review reaches the final results stage. Here, Commerce refused to consider pages from Fischer's sales agreement establishing that the dumping margin in the preliminary results was inaccurate. The Court finds that, in doing so, Commerce abused its discretion.

In Timken, upon reviewing the preliminary results of the administrative review of an antidumping duty order, the respondent (like Fischer) allegedly realized that it had "inadvertently and inaccurately" misreported sales data important in calculating an accurate dumping margin. 434 F.3d at 1347-48. Like Fischer, Timken submitted documentary exhibits with its case brief and requested that Commerce correct the alleged error on the basis of those documents. Id. at 1348. Commerce refused in Timken to consider the new information on the basis, inter alia, that the errors were not "clerical" and therefore did not satisfy the Colombia Flowers criteria, and published the Final Results without corrections. Id. On appeal, the Court of International Trade (CIT)

rejected Commerce's application of the <u>Colombia Flowers</u> test based on its concern that rejecting Timken's new information "would render a grossly erroneous dumping margin," and remanded for Commerce to recalculate the dumping margin upon consideration of Timken's new information. <u>Id.</u> (citing <u>Timken U.S. Corp. v. United States</u>, 28 C.I.T. 329, 318 F. Supp. 2d 1271, 1277-79 (2004)). Commerce considered Timken's new evidence on remand and found it insufficiently reliable to use; the CIT subsequently affirmed that determination. <u>Id.</u> at 1349. When Timken appealed to the CAFC, Commerce argued, as an alternative ground for affirmance, that the CIT erred in initially remanding for consideration of Timken's new evidence since the new evidence was not limited to correcting clerical errors. <u>Id.</u> at 1351. The CAFC disagreed with this argument "[o]n the merits." <u>Id.</u> The CAFC noted that the government did not "identify any statute or regulation" supporting its contention that only clerical errors could be corrected once the preliminary results issued. <u>Id.</u> at 1351-52. The CAFC noted that it had held, in <u>NTN Bearings</u>, that a refusal to consider corrective information offered in response to the preliminary results on the basis of untimeliness constituted an abuse of discretion where correction of the errors involved only a "straightforward mathematical adjustment" that "would neither have required beginning anew nor have delayed making the final determination." <u>Id.</u> at 1353 (quoting 74 F.3d at 1208). In affirming the

CIT's remand order that Commerce consider the new information submitted with

Timken's case brief, the CAFC explained:

> [T]he government seemingly aims to save itself from having to evaluate corrective information . . . whether correction is sought at the preliminary results stage or the final results stage.  This court, however, has never discouraged the correction of errors at the preliminary result [sic] stage; we have only balanced the desire for accuracy in antidumping duty determinations with the need for finality at the final results stage. . . .  [B]ecause Timken sought correction of its errors after Commerce issued the preliminary results, but before it issued the final results, we conclude that the Court of International Trade . . . did not err in remanding the case to Commerce for an analysis of Timken's new evidence.

Id. at 1353-54.

NTN Bearing also bears a strong resemblance to the current case.  Like Fischer,

NTN Bearing responded to the preliminary results of an antidumping duty

administrative review with a case brief, accompanied by supporting documentary

evidence showing that it had made reporting errors—NTN Bearing had (1) accidentally

misidentified the goods in certain United States sales and (2) mistakenly listed a number

of sales to Canadian customers as United States sales.  NTN Bearing, 74 F.3d 1204, 1205

(Fed. Cir. 1995).  Commerce rejected NTN Bearing's evidence as "untimely data" under

the then-applicable regulation limiting the submission of factual information.[15]  Id. at

---

[15] 19 C.F.R. § 353.31(a) (1995) (imposing a deadline for factual information of "the earlier of the date of publication of notice of preliminary results of review or 180 days after the date of publication of notice of initiation of the review.")

1206-07.  The CAFC stated that a regulation "not required by statute," such as the timeliness regulation, "must be waived where failure to do so would amount to an abuse of discretion," and held that Commerce abused its discretion when it "refused to consider correction of these errors because of the 'untimely' submission of the corrective information," emphasizing that "[i]t is the duty of [Commerce] to determine dumping margins as accurately as possible" and that "the antidumping laws are remedial, not punitive."  Id. at 1207-08 (citations and quotations omitted); see also World Finer Foods, Inc. v. United States, 24 C.I.T. 541, 2000 WL 897752 (2000) (requiring Commerce to accept corrections to mistaken reporting that plaintiff only became aware of upon review of the preliminary results). The CAFC noted that failure to perform the "straightforward mathematical adjustment" called for by the new information "resulted in the imposition of many millions of dollars in duties not justified under the statute." NTN Bearing, 74 F.3d at 1208.

On the authority of Timken and NTN Bearing, the Court holds that Commerce abused its discretion in rejecting Fischer's additional agreement pages as untimely. Doing so was an abuse of discretion because (1) no finality concerns demanded exclusion of the additional data at the preliminary results stage; (2) failure to consider the additional pages to correct information already provided was a violation of Commerce's duty to determine Fischer's dumping margin as accurately as possible;

(3) consideration of the additional data is necessary to ensure that the remedial, non-punitive nature of the antidumping laws is not violated by imposition of inaccurately high antidumping duties on Fischer despite the evidence that was rejected; and (4) the recalculation of Fischer's dumping margin could be accomplished by simply replacing the actual Brix levels reported by Fischer in its database with the standard Brix level of 11.8 degrees, should Commerce determine upon remand that the sales agreement pages in fact substantiate that Brix levels above 11.8 degrees did not increase the United States unit price of Fischer's NFC.

Furthermore, Uniroyal, Yantai, and Tianjin are all consistent with this result. In those three cases, the plaintiffs either failed to respond to a questionnaire from Commerce (Uniroyal) or failed verification (Yantai and Tianjin), then later asked the court to overturn Commerce's rejection of untimely fact submissions and Commerce's consequent application of adverse facts available. Uniroyal, 626 F. Supp. 2d at 1313-14, Yantai, 521 F. Supp. 2d at 1360-62, Tianjin, 353 F. Supp. 2d at 1303-04. In upholding Commerce's enforcement of its regulatory deadline for factual information, the courts noted that the information the plaintiffs offered did not correct a mistaken previous submission, but instead attempted to fill the gap caused by failure to provide a questionnaire response or evidence requested during verification. Uniroyal, 626 F. Supp. 2d at 1314, 1316 (highlighting respondent's inability to demonstrate that it had

submitted the questionnaire response at issue to Commerce), Yantai, 521 F. Supp. 2d at 1370 (noting that Timken did not apply because it allows "submission of information after a preliminary determination to correct errors of information already on the record," not "new factual information after Commerce issued the preliminary results"), Tianjin, 353 F. Supp. 2d at 1304 (stating that Commerce "is under no obligation to request or accept substantial new factual information from a respondent after discovering that a response cannot be corroborated during verification.").

Finally, the Court finds the Colombia Flowers test inapplicable to this case. Timken squarely rejected the limitations of the Colombia Flowers criteria to the extent that those criteria restrict correction of errors at the preliminary results stage, and the United States does not argue that Colombia Flowers should apply here.

The Court further notes that Defendant asserts that Commerce rejected Fischer's additional information not only on a timeliness basis but also (or perhaps only) on the merits. The argument is unpersuasive, however, because Commerce rejected the additional agreement pages that Fischer submitted, and did not consider that evidence in its subsequent determination that the conversion of United States sales to pounds-solids using actual Brix was proper. When it rejected the pages from the agreement that indicated the Brix level at which Fischer priced its NFC sales in the United States, Commerce lost the ability to evaluate whether Fischer's claim of error in the conversion

methodology had merit. Simply put, Commerce has not yet considered whether

Fischer's dumping margin is inaccurate due to having been calculated on the mistaken

premise that Fischer priced its NFC based on its sweetness, rather than volume

regardless of sweetness. The Court therefore remands to Commerce to (1) examine the

additional agreement pages submitted by Fischer with its Case Brief dated May 8, 2008;

(2) determine whether the agreement set the price for Fischer's NFC in the United States

in a Brix-neutral manner; and (3) recalculate Fischer's dumping margin based upon

consideration of the additional agreement pages.

      **C.**      **Conversion of Fischer's Home Market Sales**

In contrast to Fischer's additional agreement pages suggesting that United States

gross unit prices might have been distorted by the use of actual Brix in the conversion to

pounds-solids, Fischer's contentions regarding home market pricing find no support. In

the first place, as noted above, Fischer's argument as to how Commerce should have

converted home market sales from kilograms into pounds-solids is unclear and possibly

inconsistent. Fischer does not point to reliable documentation such as sale agreement

excerpts to establish the alleged home market conversion error. Instead, Fischer merely

offers the bare assertion that it misreported minimum Brix levels for home market sales.

That assertion might find support in the product specification sheets showing minimum

Brix for home market sales was set at 10.5 degrees—if the home market sales listing did

not belie Fischer's contention, showing that Fischer reported home market sales priced at varying Brix levels, rather than consistently priced at the minimum Brix level. (See CR 3, Ex. 2.)

Given that Fischer appears not to have reported the incorrect sales Brix level as it alleges, the Court finds no reason to question Commerce's reliance on the information Fischer supplied during the investigation. The Court therefore affirms Commerce's conversion of the home market sales from kilograms into pounds-solids using the Brix levels reported by Fischer, and holds that Commerce's determination in this respect was supported by substantial evidence and in accordance with law.

### D. Inventory Carrying Costs

#### 1. Positions of the Parties

Although Fischer contends that Commerce calculated home market inventory carrying costs incorrectly, Fischer's position regarding this alleged error has shifted over time. In its Resubmitted Case Brief, Fischer argued that, "as the Department has established three CONNUMs for the products,[16] the average inventory carrying cost should similarly be based on the average carrying charge for the specific product," and

---

[16] CONNUM refers to a unique number which is assigned for purposes of the administrative review to each distinct commercial product analyzed. In this administrative review, three CONNUMs were established to distinguish Fischer's three products: FCOJ, NFC, and a product known as "Dairy Pak."

that "[t]he Department should adjust this calculation to reflect the average time only NFC was held in inventory." (Resubmitted Case Brief at 6.)

In its motion papers, Fischer stated that it determined after the preliminary results that "the calculation of inventory carrying costs . . . were not consistent with Commerce's requirement that cost be calculated by Connum" because "Commerce calculated inventory carrying cost based upon an average inventory cost for all products," instead of "the actual carrying charge associated with NFC sales and a separate charge associated with FCOJ sales." (Public Motion at 29.) In its motion, Fischer contended that it "presented customer invoices tied to home market sales already on the record to clarify the production dates and amount of time that the product was held in inventory." (Id.)

Finally, in its reply in support of its motion, Fischer argued that Commerce, in the second administrative review, abandoned the inventory carrying cost methodology used in the first administrative review, contested in this lawsuit, and therefore the Court should not defer to Commerce. (Public Reply at 12.) Fischer stated that it was not alleging "that Commerce failed to calculate separate average inventory carrying costs for NFC and FCOJ." (Id.) Instead, Fischer claimed that it took the position that "Commerce's calculation of an average NFC inventory carrying period for the Connum resulted in an inaccurate calculation of home market NFC inventory carrying charges"

since it calculated "a general average movement of all NFC produced that was held in inventory during the period of review." (Id. at 12-13.) According to Fischer's Public Reply, Commerce thus ignored "the true length of time that the product was held in inventory" as demonstrated by date-of-production data for the home market NFC sales under consideration, which allegedly showed "the specific dates of production and days held in inventory to enable Commerce to properly calculate NFC inventory carrying cost." (Id. at 12-13.)

The government asserts that Commerce did, in fact, calculate inventory carrying costs "by using the product-specific inventory carrying costs for FCOJ and NFC that Fischer reported" in the Section B response. (Def.'s Public Opp. at 24.) Defendant therefore states that, "contrary to Fischer's allegations, its reported inventory carrying costs are product specific," since Fischer reported separate inventory carrying costs for NFC and FCOJ. (Id. at 25.) Commerce also asserts that it acted in accordance with its timeliness regulations in rejecting new factual information regarding "home market inventory carrying costs" submitted by Fischer with the Case Brief. (Id.) Defendant-Intervenors take a position consistent with that of the government. (Def.-Int.'s Public Opp. at 21-22.)

     2.     <u>Analysis</u>

The Court finds that the record establishes that Commerce did, in fact, calculate inventory carrying costs on the basis requested by Fischer in its Case Brief and Public Motion. Fischer emphasized in those briefs that Commerce should ensure that the calculation of inventory carrying cost was (1) product-specific and (2) averaged. Commerce, in its calculations, relied on documents provided by Fischer that demonstrate inventory carrying costs (1) by specific product (NFC vs. FCOJ), and (2) average those costs within each specific product category. (<u>See</u> Section B Response at Ex. 12 (PR 24, CR 3) (containing two spreadsheet reports, averaging carrying costs separately for NFC and FCOJ); <u>see also</u> <u>FR Notice (unpublished) from Analyst/IA to file</u> <u>final results/ partial rescission/ issues and decision memo</u> (Aug. 5, 2008) at 40 (PR 117) (Commerce "relied on the calculations Fischer provided in its June 1 [2007] submission [i.e., Section B Response]; these calculations were specific to FCOJM[17] and NFC because they were based on both the costs for these individual products as well as their specific inventory carrying periods.").) Thus, Fischer's Public Motion contending that Commerce should have calculated inventory carrying costs in the manner that Commerce did, in fact, calculate inventory carrying costs is denied as moot.

---

[17] Frozen concentrated orange juice for manufacture, also known as FCOJ.

The ground for error argued in Fischer's Public Reply is that Commerce should have calculated the inventory carrying cost of the specific NFC that was the subject of each home market NFC sale under consideration, based upon the actual dates that those drums of NFC were held in inventory between production and shipment. The Court finds that Fischer's submissions to Commerce did not, fairly read, articulate this position. Therefore, this argument was not preserved at the administrative level; to the extent that Fischer now raises the argument in its Public Reply to support its motion, it is denied as unpreserved. See Woodford v. Ngo, 548 U.S. 81, 90 (2006) (citations omitted), see also Paul Müller Industrie Gmbh & Co. v. United States, 31 C.I.T. 1084, 502 F. Supp. 2d 1271, 1275 (2007) ("The doctrine of exhaustion provides that no one is entitled to judicial relief . . . until the prescribed administrative remedy has been exhausted.") (citations and quotations omitted). Commerce's calculation of inventory carrying cost for NFC was supported by substantial evidence in the record and in accordance with law, and the Court therefore affirms that part of the Final Results.

### E.      Application of the 90/60 Day Contemporaneity Rule

#### 1.      Positions of the Parties

Fischer argues that Commerce applied its 90/60 day contemporaneity rule, 19 C.F.R. § 351.414(e)(2), to compare three United States sales with a home market sale that occurred prior to the preliminary determination in the original antidumping

investigation and the beginning of the POR. Fischer claims that Commerce used the 90/60 day contemporaneity rule in a fundamentally unfair manner when it applied the rule to sales Fischer made prior to the POR because Fischer did not at that time have notice that its sales might be subject to such a comparison. In what Fisher asserts to be an issue of first impression, Fischer also argues that Commerce's use of the 90/60 day contemporaneity rule in this manner violated 19 C.F.R. § 351.213(e)(1)(ii), which Fischer reads as mandating that first administrative reviews only cover entries, exports, or sales occurring on or after the date of suspension of liquidation. According to Fischer, the conflict arises when the 90/60 day contemporaneity rule, as here, permits selection of a home market sale occurring outside the POR for comparison purposes. (Public Motion at 30-33.)

Defendant and Defendant-Intervenors counter that Fischer misreads 19 C.F.R. § 351.213(e)(1)(ii), which limits the period of <u>United States</u> sales to be considered, but is silent as to the dates of home market sales that Commerce may examine. Defendant also argues that Fischer's fair notice contention "appears to be arguing that Commerce has a duty to give foreign producers an adequate opportunity to game the system to avoid paying antidumping duties" and that, in any event, the promulgation of the 90/60 day contemporaneity rule itself gave Fischer notice that such sales might be considered

by Commerce in a first administrative review.  (Def.'s Public Opp. at 25-29; Def.-Int.'s

Public Opp. at 25-34.)

>        2.        Analysis

Defendant and Defendant-Intervenors are correct that the POR regulation only

limits the period of United States sales that Commerce may consider in an

administrative review.  19 C.F.R. § 351.213(e)(1) (referring to "entries, exports, or sales

of the subject merchandise"); 19 U.S.C. § 1677(25) (indicating that "subject merchandise"

refers to various types of merchandise sold within the United States).  It is unsurprising

that only sales made within the United States can be "subject" to antidumping duties

imposed by the United States.  Therefore, the Court holds that the 90/60 day

contemporaneity rule, which applies only to home market sales by foreign producers,

does not conflict with the POR regulation.

Furthermore, the Court is unpersuaded by Fischer's fundamental-fairness and

lack-of-notice arguments.  Commerce is correct that the mere fact of publication of the

90/60 day contemporaneity rule gives Fischer sufficient prior notice.  As to fundamental

fairness, this Court declines to find that Fischer is entitled to know in advance whether a

particular sale it makes will be reviewed to determine whether Fischer is making sales

at less than fair value.  Commerce promulgated the 90/60 day contemporaneity rule

under its broad authority to give effect to the antidumping statutes; the Court defers to

that rule and will not upset it.  The Court therefore finds that Commerce acted within its lawful authority and in accordance with law in its application of the 90/60 day contemporaneity rule, and affirms the Final Results to the extent that Commerce relied on application of the 90/60 day contemporaneity rule to a home market sale occurring prior to the POR.

### F.      Oral Argument

The Court having determined that oral argument is unnecessary here, Fischer's Motion for Oral Argument is denied.

### CONCLUSION

For the reasons given above, this Court affirms in part and remands in part the Final Results.  It is hereby

**ORDERED** that Fischer's Motion for Summary Judgment on the Agency Record is partially granted and partially denied; and it is further

**ORDERED** that the Final Results of the first administrative review of the antidumping duty order on Certain Orange Juice from Brazil are remanded to Commerce to (1) examine the additional agreement pages submitted by Fischer with its Case Brief dated May 8, 2008; (2) determine whether the agreement set the price for Fischer's NFC in the United States in a Brix-neutral manner; and (3) recalculate Fischer's

dumping margin based upon consideration of the additional agreement pages; and it is further

ORDERED that the Final Results of the first administrative review are affirmed in all other respects; and it is further

ORDERED that Commerce shall file with this Court the remand results no later than May 10, 2010; that Plaintiffs may file comments with this Court indicating whether they are satisfied or dissatisfied with the remand results no later than May 31, 2010; and that Defendant and Defendants-Intervenor may file responses to Plaintiffs' comments no later than June 21, 2010.

SO ORDERED.


                                                      /s/ Gregory W. Carman
                                                      Gregory W. Carman


Dated:          April 6, 2010
                New York, NY